UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DALE L. WHITTINGTON, JR.,

      Plaintiff,                             Case No. 19-cv-01631-PBG-DCI

v.

NERISSA J. WHITTINGTON, individually, and as
Trustee of the Dale L. Whittington, Jr. Trust dated
August 1, 1995,

      Defendants.

_____/


**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S *DAUBERT*
MOTION TO EXCLUDE TESTIMONY AND REPORT OF LES W. EISERMAN**

Plaintiff, Dale L. Whittington, Jr. ("Dale Jr."), pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), hereby responds in opposition to Defendant Nerissa J. Whittington's ("Nerissa") *Daubert* Motion to Exclude Testimony and Report of Les W. Eiserman. [D.E. #70] (the "Motion").

## I.    SUMMARY OF ARGUMENT

Nerissa seeks to exclude the opinions of Les W. Eiserman ("Mr. Eiserman") regarding the value of the GLI and GWI stock once owned by the Trust.  Nerissa's complaints about Mr. Eiserman's opinions fall into three categories, none of which provide a basis for exclusion:

(1)    Nerissa faults Mr. Eiserman for not obtaining a real estate appraisal valuing the buildings owned by GLI and GWI as of the date that Nerissa sold the Trust's stock.  But a formal appraisal is not always necessary to estimate the value of a business's assets.  As courts have held and as Mr. Eiserman testified, a business valuation expert can rely on management's valuation of a company's assets.  In this case, the buildings owned by GLI and GWI were valued by their management in contemporaneous sworn partnership formation documents.

(2)    Nerissa criticizes Mr. Eiserman for relying on the values for the GLI and GWI real estate stated in the partnership documents.  Nerissa contends that the values were unreliable and were not independently verified by Mr. Eiserman.  However, there was nothing inherently unreliable about using the values stated in the partnership documents.  The documents were created by Jack Ziegler ("Ziegler") – who, for over 20 years, held the positions of CEO, COO and CFO of Dale Sr.'s multiple business operations, and who had extensive experience with Dale Sr.'s real estate developments and the buildings at issue.  The documents were duly approved by GLI and GWI management.  Nor did Mr. Eiserman just accept the building values in the partnership documents without question – he tested them for

1

reasonableness with a "sanity check" based on the revenue and expenses for each entity as reported in their tax returns.

(3)     Nerissa argues that Mr. Eiserman erred in determining various values in his sanity check. But as Mr. Eiserman testified, his sanity check was only an *estimate* to analyze the reasonableness of the asset values stated in the partnership documents, not an independent assessment of value, so perfect precision was unnecessary. Viewed in that light, all the supposed flaws in Mr. Eiserman's sanity check (such as purportedly incorrect deductions and capitalization rates) involved judgment calls where reasonable experts could differ.

In short, Nerissa claims that Mr. Eiserman did not use enough data to establish the value of GLI and GWI, relied on erroneous or improper data, and erred in applying his valuation methodology to the data. However, the analysis under *Daubert* turns on whether an expert's methodology "***in the abstract***, is reliable," not whether the right data was used or whether the methodology obtained accurate results in the particular case. *See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003) (emphasis supplied). Nerissa's criticisms go to the weight of Mr. Eiserman's opinions, not their admissibility, and are at most fodder for "vigorous cross-examination" and "presentation of contrary evidence" at trial. *Id.* Nerissa's Motion should be denied.

## II.     DALE JR.'S DAMAGES CLAIM

Dale Jr. is the beneficiary of the Trust created by his father, Dale L. Whittington ("Dale Sr."), named the Dale L. Whittington, Jr. Trust dated August 1, 1995 (the "Trust"). The Trust once owned shares of stock in two Florida companies incorporated by Dale Sr., namely, 20 shares of stock in Gulfstream Lomas, Inc. (20% of "GLI") and 50 shares of stock in Gulfstream Worldwide, Inc. (10% of "GWI"). Nerissa, as trustee of the Trust, sold the Trust's

stock in GLI and GWI to other trusts benefitting herself and her siblings via two Stock Purchase Agreements ("SPAs"), dated September 2, 1997. Nerissa signed the SPAs as trustee of the Trust, and as a "Buyer" of the stock on behalf of her own trust and the trusts of her sister Keely and brother in law Scott.

In 1997, Dale Jr. was an 11-year-old child living with his mother (Dale Sr.'s ex-wife) in Orlando, Florida, and neither Dale Jr. nor his mother knew anything about the Trust or the SPAs. Less than two years later, Nerissa and Keely became the sole directors of GLI and GWI. They subsequently parlayed the companies' assets into various real estate developments which Nerissa and her sister control to this day.

As a result of the SPAs, Nerissa and her siblings' trusts ended up with all of the Trust's stock in GLI and GWI. Dale Jr. alleges that this stock was worth considerably more than the $87,500 sale price listed in the SPAs. As such, even if one assumes that Dale Sr. or the Trust actually received any monies pursuant to the SPAs (there is no competent evidence of any such payments), Nerissa's self-dealing harmed her minor beneficiary because she was able to buy out the Trust's interest in the companies for a fire sale price.

### III.  MR. EISERMAN'S OPINIONS

Dale Jr. engaged Mr. Eiserman to opine on the fair market value of the GLI and GWI stock held by the Trust at the time Nerissa sold it. Mr. Eiserman is a licensed CPA and Certified Valuation Analyst with over 30 years of auditing and consulting experience and over 20 years of business valuation and forensic services experience. *See* D.E. #70-2, May 22, 2020 Report of Les W. Eiserman ("Eiserman Report"), at Exhibit H (curriculum vitae). Mr. Eiserman has valued entities owning real estate in numerous situations, including with respect to family law, estate planning, and gifting. *See* D.E. #75-1 (Eiserman Dep.) at 12:7-14. Mr.

Eiserman and his firm perform analyses like the one he conducted in this case on a "weekly basis." *Id.* at 17:17-20.

### A.    The NAV Method and the Gulfstream Partnership Documents

To determine the value of the GLI and GWI stock, Mr. Eiserman employed the net asset value ("NAV") method, in which the reported book values of assets and liabilities held by a company are adjusted to fair market value.  *See* D.E. #70-2 (Eiserman Report) at 6.  Based on GLI and GWI's tax returns and balance sheets, the companies owned significant assets as of September 2, 1997 – namely, three commercial office buildings in Albuquerque, New Mexico.  (*Id.* at 7, 9).  Several months later, on February 10, 1998, GLI and GWI deeded these buildings to two limited partnerships, Gulfstream Lomas, Ltd. ("GLP") and Gulfstream Worldwide, Ltd. ("GWP"), to serve as capital contributions for both partnerships.  (*Id.* at 7, 9); *see also* D.E. #75-2, (Gulfstream Corp. Rep. Dep.) at 76:3-13, Ex. 44 [GWI 000494-495], and 78:1-13, Ex. 46 [GWI 000451-452].  The GLP and GWP partnership documents reviewed by Mr. Eiserman stated that the GLI and GWI buildings were worth $8,505,716 and $11,630,484.91, respectively.  (*Id.* at 8, 10); *see also* D.E. #75-2, (Gulfstream Corp. Rep. Dep.) at 71:15-23; 72:2-5; 72:23-74:21, Ex. 44 [GWI 000492] and Ex. 45 [NW 30]; and 74:23-75:18; 76:14-19; 77:11-21; 78:14-25; 79:21-82:6, Ex. 46 [GWI-000448] and Ex. 47 [NW 85].

The values of the buildings are set forth in two separate places in the partnership documents, namely: i) Exhibit A to the Agreements of Limited Partnership for both GLP and GWP (collectively, the "Partnership Agreements"), which state that the value of the GLI building is $8,505,716.00 (*see* D.E. #75-2, (Gulfstream Corp. Rep. Dep.) at 74:23-75:18, 76:14-19, 77:11-21, Ex. 46 [GWI-000448]), and the value of the GWI buildings is $11,630,484.91 (*see id.* at 71:15-23, 72:2-5, Ex. 44 [GWI-000492]); and ii) the Affidavits Declaring Amount of

Capital Contributions of the Limited Partner of GLP and GWP (collectively, the "Partnership

Formation Affidavits"). *See id.* at 72:23-73:18, Ex. 45 [NW 30], and 78:14-25, Ex. 47 [NW 85];

*see also* D.E. #70-2 (Eiserman Report) at Appendix F and N. The Partnership Agreements

and Partnership Formation Affidavits are sometimes hereinafter collectively referred to as the

"Partnership Documents."

The Partnership Agreements for GLP and GWP were both signed by Nerissa's sister,

Keely Whittington, in her capacity as GLI and GWI's corporate secretary. *See* D.E. #70-2

(Eiserman Report) at Appendix G and O; *see also* D.E. #75-2 (Gulfstream Corp. Rep. Dep.)

at 75:11-23, Ex. 44 [GWI 000491]; 76:14-19, Ex. 46 [GWI 000449].[1]

The Partnership Formation Affidavits recite the value of the cash and real property

that the General Partners and Limited Partners were contributing to the partnerships –

$10,877,000 total for GLI (*see* D.E. #75-2, (Gulfstream Corp. Rep. Dep.) at 72:23-74:13, Ex.

45 [NW 30]), and $14,176,000 total for GWI (*see id.* at 78:14-25, 79:21-82:1, Ex. 47 [NW 85])

– which correlated with the recited values of the buildings in the Partnership Agreements. *Id.*

The Partnership Formation Affidavits were signed and notarized by Jack Ziegler, as the

Executive Vice President of GWI and GLI, on February 11, 1997, and filed with the State of

Florida's Division of Corporations on February 26, 1998. *See* D.E. #75-2, (Gulfstream Corp.

Rep. Dep.) at 72:23-74:13, Ex. 45 [NW 30], and 79:21-82:1, Ex. 47 [NW 85]. Ziegler swore

under penalty of perjury that the values of the partnership capital contributions (including the

GLI and GWI buildings) stated in the Partnership Formation Affidavits were true and correct.

---

[1] Nerissa has been an officer in GWI and GLI, the General Partners of the GLP and GWP partnerships, from 1999 (*see* D.E. #75-2 (Gulfstream Corp. Rep. Dep.) at 34:23-35:8, Ex. 16; and 37:19-38:2, Ex. 17) through the present. *Id.* at 41:13-42:19, Ex. 19 and 20.

*See id.* at 72:23-74:13, Ex. 45 [NW 30] and 79:21-82:1, Ex. 47 [NW 85]; *see also* D.E. #75-11 (Ziegler Dep.) at 179:23-24, 181:13-23, 182:15-18, Ex. 49 [NW 30-31]; and 186:17-20, 188:13-15, Ex. 79.[2]

Nerissa agrees that Ziegler was "essentially Dale Sr.'s right hand." [D.E. #63 at 12]. Between 1979 until the early 2000's, Ziegler served as CEO, COO and CFO for Dale, Sr.'s multiple business operations. *See* D.E. 63-4 (Ziegler Aff.) at ¶2. By Ziegler's own account, he has over 30 years of experience in real estate, including the purchase and sale and valuations of real estate. *See* D.E. #75-11 (Ziegler Dep.) at 13:16-14:23. Ziegler was directly involved in the purchase, operation, and other aspects of the buildings, including performing marketing, financial and accounting functions for Nerissa with respect to the buildings. *See* D.E. #75-11 (Ziegler Dep.) at 24:7-14 and 28:10-29:6.

Mr. Eiserman relied on the building values disclosed in the Partnership Documents since they were created by GLP and GWP management, which had the best knowledge of the value of the buildings, and because the nature of the documents indicated they were a credible, reliable source of value. (*Id.* at 8, 10); (*see also* (Eiserman Dep.) at 84:2-20).

Using the building values stated in the Partnership Documents, Mr. Eiserman calculated adjusted book values for the total assets of GLI and GWI (including cash and

---

[2] Nerissa claims that the Partnership Formation Affidavits (which were filed with the State of Florida in February 1998) were "incorrectly dated February 1997," and so their values were not "known or knowable" as of the September 2, 1997 valuation date. *See* Mot. at 8 n.6. However, the February 11, 1997 date is reflected in eight separate places in the affidavits. There are also numerous backdated documents in this case; for instance, the SPAs themselves may have been dated September 2, 1997, but were in fact signed several months later. *See* D.E. #75-19 (Glen Stankee Dep.) at 106:19-107:10, 118:17-119:5, Ex. 29 (Nov. 5, 1997 letter) [NW 179-180]. In any event, Mr. Eiserman testified that his assessment would be the same if the Partnership Formation Affidavits had been signed in 1998 and not 1997. *See* D.E. #75-1 (Eiserman Dep.) at 108:4-14.

equivalents, escrow, and other assets apart from the buildings) and for the total liabilities of GLI and GWI (including accounts payable, accrued expenses, deferred taxes, and long-term liabilities). *See* D.E. #70-2 (Eiserman Report) at Ex. B and Ex. E. Mr. Eiserman determined that the net asset values for GLI and GWI were $4.68 million and $8.31 million, respectively. *Id.* Mr. Eiserman discounted those values for lack of control and lack of marketability, and thereby valued Dale Jr.'s 20% interest in GLI and 10% interest in GWI at $531,900 and $599,330, respectively. *See* D.E. #70-1, Ex. 1 (Eiserman Report) at Ex. A and Ex. D.

**B.      The Sanity Checks and Addenda**

Mr. Eiserman proceeded to conduct a "sanity check" to confirm that the values reflected in the Partnership Documents were reasonable. He determined an estimated cash flow for the buildings based on the revenue and expenses reported on the 1998 and 1999 tax returns for the partnerships, adding back interest, subtracting assumed taxes, and adding back depreciation. (*Id.* at 8, 10). He then divided by a capitalization rate he determined after researching 1997-era information from the National Council of Real Estate Investment Fiduciaries ("NCREIF"). Mr. Eiserman's sanity checks estimated that the GLI and GWI real estate was worth about $7.5-7.6 million and $10.8-$12.9 million, respectively, as of September 1997, which supported the asset values disclosed in the Partnership Documents. (*Id.* at 8, Ex. C and 10, Ex. F).

After his initial report, Mr. Eiserman prepared two addenda. The first addendum was made with the express assumption that certain debt owed by GLI and GWI, as reflected in a Memorandum of Understanding, dated August 28, 1997, had been forgiven prior to the SPAs, but that the forgiveness had not been reflected on the financial statements of GLI and GWI. *See* D.E. #70-4, June 11, 2020 Addendum to Eiserman Report ("First Addendum"). As Mr.

Eiserman stated in his initial report, assuming the debt owed by GLI and GWI was forgiven, this would result in a higher valuation of GWI and GLI. *See* D.E. #70-2 (Eiserman Report) at 8, 10. Contrary to Nerissa's argument in her Motion (Mot. at 14, 20, n. 14), Mr. Eiserman did not "decide" that the debt owed by GLI and GWI had been forgiven when he prepared his First Addendum. The First Addendum was prepared to simply calculate the increased value of GLI and GWI, *assuming* the debt forgiveness. *See* D.E. #70-4 (First Addendum) at 1. Indeed, Mr. Eiserman makes it plainly clear in his First Addendum that his updated damages calculations are based on the "specific assumption" that the debt was forgiven. *Id.*

The second addendum was prompted by the Gulfstream companies' belated production of two appraisals for the GWI buildings, which valued them at $10.7 million as of October 4, 1999. *See* D.E. #70-5, July 23, 2020 Addendum to Eiserman Report ("Second Addendum"). While Mr. Eiserman did not actually rely on the appraised values (as the appraisals were performed two years after the SPAs), he used the 1996 and 1997 financial data *within* the appraisals to update his sanity check for GWI using two independent methods: (1) calculating an ongoing cash flow for GWI for 1996 and 1997 and dividing that by the capitalization rate Mr. Eiserman had previously determined, and (2) calculating a new capitalization rate using the asset values in the Partnership Documents and the GWI normalized operating income for 1996 and 1997, and then comparing that rate to the market cap rates in 1997. *See id.* at 2-3. Again, both estimates supported the values established by management for the GWI buildings. *Id.*

## IV.  ARGUMENT

Under *Daubert*, courts consider whether "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the

8

expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 988 (11th Cir. 2016).

However, *Daubert* "is not intended to supplant the adversary system or the role of the jury," and "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1341. "The admissibility standard for expert testimony is a liberal one, and a review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." *James v. Robert Bosch Tool Corp.*, No. 6:13-CV-1534-ORL-37, 2015 WL 470586, at *2 (M.D. Fla. Feb. 4, 2015).

At bottom, Nerissa's complaints about the assumptions underlying Mr. Eiserman's opinions go to the weight of those opinions and not their admissibility. Under *Daubert,* experts are permitted "wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation". *Daubert,* 509 U.S. at 592. "An expert may base an opinion on facts or data in the case that the expert has *been made aware of* or personally observed." Fed. R. Evid. 703 (emphasis added). "[Q]uestions relating to the *bases and sources* of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Viterbo v. Dow Chem Co.,* 826 F. 2d 420, 422 (5th Cir. 1987) (emphasis added); *accord Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) ("objections

to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility").[3]

In this case, Nerissa's *Daubert* challenge boils down to three contentions: (1) that Mr. Eiserman needed a real estate appraisal to value the GLI and GWI buildings (*see* Mot. at 6-8 and 16-19); (2) that Mr. Eiserman could not rely on the building values stated in the GLP and GWP partnership documents (*see* Mot. at 8-11 and 19-22), and (3) that Mr. Eiserman's sanity check analysis to confirm the reasonableness of those asset values considered the wrong data and contained various errors. (Mot. at 11-13 and 22-23).

Nerissa's criticisms are unfounded, because (1) a business valuation expert can rely on management's valuation of a company's assets without a formal appraisal, (2) the values stated by management in the GLP and GWP Partnership Documents were reasonably reliable and evaluated by Mr. Eiserman via "sanity check" calculations based on other data, and (3) Mr. Eiserman's sanity checks are not purporting to be an independent assessment of asset value, so any flaws in the calculations and data he used go to weight and not admissibility.

## A.    Mr. Eiserman could rely on management's valuation of the GLI and GWI real estate assets without a separate appraisal.

Nerissa first argues that Mr. Eiserman is not qualified to value the GLI and GWI buildings because he is not a real estate appraiser and did not have an appraisal of the buildings.

---

[3] *See also In re Disposable Contact Lens Antitrust,* 329 F.R.D. 336, 373 (M.D. Fla. 2018) (finding that "[d]efendant's criticisms of the factual foundations for [expert's] opinions bear more on the weight of the evidence than its admissibility"); *Fla. Transp. Serv., Inc. v. Miami-Dade County,* 2009 WL 10696630, Case No. 05-22637-CIV-JORDAN-MCALILEY, *5-6 (S.D. Fla. Dec. 30, 2009), *adopted by* 2010 WL 11591198, *1 (S.D. Fla. Feb. 10, 2010) (denying *Daubert* motion to exclude expert report, and recognizing that "[i]t is routine for experts to base opinions on clearly-stated assumptions", and that defendant can challenge the arguably self-serving nature and validity of the assumptions "through cross-examination", "the testimony of its own expert, and the introduction of other evidence").

*See* Mot. at 16.  While an appraisal might be ideal in some situations, business valuations are often done without "perfect information," and a business valuation expert is permitted to use the best information available if those sources are properly documented and disclosed.  *See* D.E. #75-1 (Eiserman Dep.) at 34:2-35:1 (describing the standards set by the National Association of Certified Valuators and Analysts ("NACVA")). Specifically, an expert may rely on management's valuation and analysis of a company's real estate without obtaining a separate appraisal.  *See* D.E. #75-1 (Eiserman Dep.) at 13:2-17.  Even Nerissa's rebuttal expert, business valuator Michael Elkin, had to admit that a separate appraisal of a company's real property is not strictly required to value the company as a whole.  *See* D.E. #75-22 (Elkin Dep.) at 101:11-20 and 125:6-126:4.  And Elkin also admitted that an appraisal is not always needed to perform a sanity check.  *See id.* at 163:13-19.

Courts have admitted business valuation experts in similar circumstances.  In *Maiz v. Virani*, 253 F.3d 641, 664 (11th Cir. 2001), the plaintiff investors retained an economist to opine on their "lost value" damages for an investment in a Georgia real estate venture.  On appeal, the defendants argued that the district court should have excluded the expert, since he had "no real estate development experience and thus no basis to opine regarding how the pilfered funds would have been invested by the Plaintiffs" in real estate.  *Id.* at 665.  The Eleventh Circuit affirmed, holding that the expert could "testify based upon his ***assumption*** that the performance of a REIT index was an appropriate benchmark for gauging the profits that Plaintiffs would have earned," and that any problems with the expert's assumptions were matters for cross-examination.  *Id.* at 664-66 (emphasis added).

In *Yardelle Inv. Mgmt., LLC v. Bank of N. Georgia*, No. 1:10-CV-1685-ODE, 2011 WL 13217188, at *9 (N.D. Ga. June 6, 2011), the defendant tried to exclude a business valuation

expert by arguing, as Nerissa does here, that the expert ultimately was "opining regarding the
value of real estate" but was not "a Georgia licensed real estate appraiser." The district court
denied the *Daubert* motion, finding that the expert was only "valuing" real estate "as one aspect
of the over-all value assessment" and was qualified to calculate the value of the plaintiff's
investment in the real estate development project. *See id.* at *10.

In *Marcus v. Quattrocchi*, No. 08 CV 9514 VB, 2014 WL 521340, at *16 (S.D.N.Y. Feb.
4, 2014), the district court denied a *Daubert* motion directed to "an expert in business
valuation." The court rejected the argument that the expert "lacks any of the qualifications
needed to value real estate, the principal asset of the . . . partnership." *Id.* The court found
that the expert could rely on rent multipliers "generated by the grantor" and rent rolls
"provided by defendants themselves" to obtain the market value of the real estate for the
purposes of valuing the partnership, and that challenges to the reliability of those sources of
data were a "subject for cross-examination." *Id.* at *16-17.

The cases relied on by Nerissa are readily distinguishable. The expert in *In re Land
Ventures for 2, LLC v. Fritz*, No. 2:12CV240-SRW, 2014 WL 10590295, at *11 (Bankr. M.D.
Ala. July 18, 2014) relied on real estate values in bankruptcy schedules filed by the debtor's
shareholder, which were "self-serving" and unreliable as a matter of law. The expert also did
nothing to check the reasonableness of the values, even though they were "contradicted by
findings of fact made by the Bankruptcy Court." *See id.* The dispute in *Morton's of
Chicago/Miami, LLC v. 1200 Castle 100-A, Inc.*, No. 13-23366-CIV, 2014 WL 11944282, at *4
(S.D. Fla. Sept. 22, 2014) concerned not a business valuation but a *real estate* valuation; the
court found that a restaurant broker could not opine on the fair market rent for a property
since he did not use *any* sources or methodology "beyond mere speculation." In *Feduniak v.*

12

*Old Republic Nat'l Title Co.*, No. 13-CV-02060-BLF, 2015 WL 1969369, at *5 (N.D. Cal. May 1,

2015), the expert "invented an 'index' for measuring diminution in value" that "ha[d] never

been used to value property before and likely never will be used again."  The expert in *Hebbler*

*v. Turner*, No. CIV.A. 03-388, 2004 WL 414821, at *3 (E.D. La. Mar. 3, 2004) offered a "two-

page report" with untestable pure *ipse dixit* as to the market rent of the properties at issue,

based only on personal experience and "unprovided, non-referenced comparable materials."[4]

It must be noted that Nerissa is trying to hold Mr. Eiserman to an unreachable

standard.  As the nation's highest Court has stated, "even in the ordinary case, assessment of

market value involves the use of *assumptions*, which make it unlikely that the appraisal will

reflect true value with nicety."  *U.S. v. Miller*, 317 U.S. 369, 374 (1943) (emphasis added).  Here,

a competent appraisal of the GLI and GWI real property as of September 2, 1997 was virtually

impossible, due to the lack of financial records for the companies and the lack of lease

agreements and detailed rent rolls for the buildings 23 years ago.  *See* D.E. #75-1 (Eiserman

Dep.) at 63:9-17 (describing lack of leasing information).  Even Nerissa's own rebuttal expert,

real estate appraiser Bryan Godfrey, admitted that an appraisal with such limited information

would be riddled with "extraordinary" or "hypothetical" assumptions.  *See* D.E. #75-23

(Godfrey Dep.) at 35:6-36:13; 36:14-38:3, 69:9-70:2, 72:2-73:1.   Mr. Elkin likewise testified

that he does not recall ever basing a business valuation on an appraisal with such assumptions.

*See* D.E. #75-22 (Elkin Dep.) at 140:17-141:14.  Neither of Nerissa's rebuttal experts arrived

---

[4] The closest case Nerissa cites, *GWTP Investments, L.P. v. SES Americom, Inc.*, No. 3:04-CV-
1383-L, 2007 WL 7630459, at *15 (N.D. Tex. Aug. 3, 2007), likewise provides no support for
her argument.  In *GWTP*, the court allowed a business valuation expert to rely on the financial
projections of another expert, Cangelosi, as to two "teleports."  The court also found that
Cangelosi's testimony as to the value of the teleports was unreliable and excluded it.  *Id.* at *15.
That exclusion did not make the business valuation expert's opinion unreliable, however.

at their own valuation figure for GLI and GWI based on real estate appraisals valuing the property as of September 2, 1997, nor were they ever asked to do so.  *See* D.E. #75-23 (Godfrey Dep.) at 37:15-18, and D.E. #75-22 (Elkin Dep.) at 25:13-26:13.

In sum, Mr. Eiserman fully adhered to professional standards in valuing GLI and GWI by relying on management's contemporaneous valuation of the companies' assets.  The accuracy of that valuation will of course be a topic for cross-examination and a battle of the experts, but it is not grounds for exclusion.

**B.      Mr. Eiserman reasonably relied on and confirmed the asset values stated in the partnership documents.**

Nerissa argues that Mr. Eiserman could not rely on the building values stated in the GLP and GWP Partnership Documents.  Nerissa claims that Mr. Eiserman did not verify the values, and that the values themselves are inaccurate.  (Mot. at 3, 8-11, 19-22).

Nerissa's first point is simply incorrect.  Mr. Eiserman was confident that the stated values in the Partnership Documents were sufficiently reliable, because they were sworn to by Ziegler, who was not only routinely involved in valuing the companies' real estate (*see* D.E. #75-11 (Ziegler Dep.) at 13:16-14:23)), but was also directly involved in the purchase, operation, and multiple other aspects of the buildings.  *See* D.E. #75-11 (Ziegler Dep.) at 24:7-14 and 28:10-29:6; *see also* D.E. #75-1 (Eiserman Dep.) at 15:1-16, 106:19-107:21.  Indeed, Ziegler prepared extensive financial summaries, memoranda and other documents where he

opined on the value of the buildings.[5]  Thus, the documents that Mr. Eiserman reviewed indicated that Ziegler had intimate knowledge regarding the operations and value of Dale Sr.'s real estate developments, including the GLI and GWI real estate.

Under these circumstances, an expert's supposed failure to verify the contents of the documents he relies on is not grounds for exclusion. *Bray & Gillespie IX, LLC v. Hartford Fire Ins. Co.*, No. 6:07-CV-326-ORL-DAB, 2009 WL 1046354, at *3 (M.D. Fla. Apr. 20, 2009) (argument that expert "failed to verify the contents of the profit and loss statements upon which he based his entire business interruption calculation" was "fodder for cross examination and rebuttal," but did not justify exclusion).

In any event, Mr. Eiserman did not just accept the building values stated in the Partnership Documents, he also performed sanity check analyses to confirm the reasonableness of management's valuation.  *See infra* at Part IV.C.  These checks were based on the companies' tax returns, which were independent of the Partnership Documents.  As Mr. Eiserman testified, this was a professionally acceptable method of confirming that the asset values stated in the Partnership Documents could be relied on.  *See* D.E. #75-1 (Eiserman Dep.) at 53:2-54:4; *see also Nutrimatix Inc. v. Xymogen, Inc.*, No. 615CV790ORL37GJK, 2017 WL 385753, at *11 (M.D. Fla. Jan. 27, 2017) (expert's opinion

---

[5] *See e.g.,* D.E. #75-11 (Ziegler Dep.), at 122:12-123:13, Ex. 3 [at Whittington 001085] (Feb. 27, 1995 Memo from Ziegler to Palma reciting value of GLI); *id.* at 123:18-124:19, Ex. 4 [at Whittington 001042] (March 21, 1995 letter from Palma reciting values from Ziegler, including $8,275,000 value for GWI); *id.* at 165:2-167:8, Ex. 27 [at Whittington 000120-121] (projecting gross income of GWI buildings at $2,956,284 and stating that their $3,500,000 investment in GWI was "now worth in excess of $10,000,000"); *id.* at 172:1-17, Ex. 27 [at Whittington 000136, n.7] (reciting GWI's market value at $10,900,000); and *id.* at 190:23-191:4, 193:12-21, 195:16-25, Ex. 56 [at GWI Subpoena 00508] (March 6, 1998 Memo reciting value of GWI as $11,500,00 and value of GLI as $9,500,00); *see also id.* at 199:6-200:1, Ex. 50 [GWI Subpoena 004166-69] (January 1998 lease summaries for GWI buildings certified by Ziegler).

15

was sufficiently reliable despite reliance on the projections of the plaintiff's principal; the expert "evaluated these projections for reasonableness" and so they were "not unduly speculative"); *Marshall Auto Painting & Collision, Inc. v. Westco Eng'g, Inc.*, No. 6:02CV-109-ORL22KRS, 2003 WL 25668018, at *6 (M.D. Fla. May 8, 2003) (expert not only relied on "assurances" of the client, but also studied financial statements, tax returns, and other documents to form his opinions).

With respect to the underlying accuracy of the building values stated in the Partnership Documents, Nerissa argues that Ziegler's testimony during this litigation shows the values in the Partnership Documents are wrong. (Mot. at 3, 10-11, 20-21). There is ample evidence, however, which demonstrates that Ziegler's after-the-fact testimony is not credible.

As an initial matter, Ziegler's repeated testimony that the values of the buildings recited in the Partnership Documents, including the Partnership Formation Affidavits that *Ziegler signed and swore to,* came from attorney Glen Stankee's office (*see* D.E. #75-11 (Ziegler Dep.) at 179:12-19, 179:23-180:8, 188:5-190:5) is directly contradicted by Mr. Stankee's testimony. Mr. Stankee does not know how the value of the buildings was determined for purposes of the partnership agreements *See* D.E. #75-19 (Stankee Dep.) at 171:11-24, 178:8-16), but he was certain that he did not arrive at the values. *See id.* at 270:11-16 (stating that "I certainly didn't perform the analysis or draw any conclusions about the value of the properties"). Mr. Stankee testified that Ziegler provided the purchase price amounts for the SPAs (*see* D.E. #75-19 (Stankee Dep.) at 267:20-268:2), and Mr. Stankee was confident that he received valuation figures for GLI and GWI at other times from Ziegler. *See id.* at 199:5-201:6 (stating that he

"must have gotten" valuation figures for Gulfstream Harbor's partnership interests in GLI

and GWI, contained in a Sept. 2, 1998 memo that Stankee authored, "from Jack [Ziegler]".[6]

In addition, correspondence from Mr. Stankee's office confirms that they asked

Ziegler to determine the values of the buildings for the purposes of the Partnership

Agreements, not the other way around.  *See* D.E. #75-19 (Stankee Dep.) 137:8-21, Ex. 34

[Stankee NP-00203].  Moreover, while Ziegler feigned ignorance when he was asked how the

building values were computed in the Partnership Documents (*see* D.E. #75-11 (Ziegler Dep.)

at 179:12-19, 179:23-180:8 and 188:5-25), as stated, Ziegler prepared multiple other documents

where he opined on the value of the buildings (*see supra* note 5), which included a March 6,

1998 Memo that he prepared just eight days after he filed the Partnership Formation

Affidavits.  In that March 6, 1998 Memo, Ziegler recited the value of **GWI as $11,500,00 and**

**the value of GLI as $9,500,00**, and conceded at deposition that these values were similar to

the values of the buildings stated in the Partnership Documents.  *See* D.E. #75-11 (Ziegler

Dep.) at 190:23-191:4, 193:12-21, 195:16-25, Ex. 56 [at GWI Subpoena 00508].[7]

---

[6] Mr. Stankee also never disagreed with the premise that Ziegler provided the values of the buildings for purposes of the partnership agreements.  *See* D.E. #75-19 (Stankee Dep.) at 184:19-185:4 and 243:24-244:9.

[7] While Ziegler vigorously attempted to disavow the valuation figures that he himself arrived at over 20 years earlier, he admitted that at the time he prepared these documents, he wanted the information to be accurate.  *See* D.E. #75-11 (Ziegler Dep.) at 162:1-4, 162:22-163:11 and 172:1-3.  Similarly, Keely Whittington, as corporate representative of the Gulfstream entities, testified that it was important that Ziegler's information was accurate (*see* D.E. #75-2 (Gulfstream Corp. Rep. Dep.) at 57:15-19, 58:3-6)), and that she did not know Ziegler to ever report inaccurate information.  *Id.* at 58:8-10.  Keely Whittington also testified that the values recited in the Partnership Documents were accurate to her knowledge.  *See id.* at 74:10-21, 81:23-82:9.  Nerissa's father, Bill Whittington, testified that he did not know Ziegler (who served as Bill's CFO for Gulfstream Harbor) to ever report inaccurate information.  *See* D.E. #75-24 (Bill Whittington Dep.) at 48:22-49:23, 50:11-12, 51:21-52:22 and 53:3-19.

There is ample evidence to question Ziegler's credibility at trial, including the fact that

he has been friends with Nerissa's father, Bill, for 55 years, *see* D.E. #75-11 (Ziegler Dep. at

19:14-23) and worked with Nerissa on multiple occasions.  *See id.* at 28:11-29:6.  But in any

event, the Court's gatekeeping function under *Daubert* does not allow it to determine the

credibility of witnesses.  *Taylor, Bean & Whitaker Mortg. Corp. v. GMAC Mortg. Corp.*, No. 5:05-

CV-260-OC-GRJ, 2008 WL 3200284, at *4 (M.D. Fla. Aug. 6, 2008).  The fact that Nerissa

presents evidence to attempt to counter Mr. Eiserman's opinions goes to the testimony's

weight, not its admissibility.  *See Eastep v. Newman,* 2013 WL 6835197, No. 1:12-cv-102 (WLS),

*2 (M.D. Ga. Dec. 20, 2013) (as long as the expert testimony has a reasonable factual basis, a

court should not exclude it, and "that there is evidence to the contrary, or that the evidence

came from a biased source, goes to the testimony's weight, not its admissibility").

## C.    Any purported flaws in Mr. Eiserman's sanity check analysis and other calculations go to their weight, not their admissibility.

Nerissa also argues that Mr. Eiserman's sanity check analysis is unreliable and

irrelevant.  (Mot. at 11-13, 22-23).  However, the methodology Mr. Eiserman used is consistent

with similar sanity checks he has performed in the past to estimate the value of real estate in

order to confirm a management valuation.  *See* D.E. #75-1 (Eiserman Dep.) at 17:1-20.  While

Nerissa quibbles with many of the values used, the sanity checks only have two significant

adjustments, which are fully documented in Mr. Eiserman's report.  The first adjustment was

to exclude about $600,000 worth of reported management fees for GLI, which were *prima facie*

unreasonable and should have not been included as an expense.  The second adjustment was

to include income taxes on operating results for GLI and GWI.  This approach was extremely

conservative; if Mr. Eiserman had not made the reduction, the building values estimated by

the checks would have been much higher, as even Nerissa's rebuttal experts admitted. *See* D.E. #75-23 (Godfrey Dep.) at 110:21-112:4; *see* D.E. #75-22 (Elkin Dep.) at 178:3-179:2.

The bottom line is that Mr. Eiserman's sanity checks confirmed management's valuation of the GLI and GWI buildings was reasonable, and that the buildings were worth millions of dollars. Any errors, assumptions, or flaws in Mr. Eiserman's sanity checks go to weight and not admissibility. *See Asokan v. Am. Gen. Life Ins. Co.*, No. 615CV2048ORL40KRS, 2017 WL 4535065, at *3 (M.D. Fla. Aug. 24, 2017) (denying *Daubert* motion for expert whose yardstick method calculated damages pre-tax, lumped all plaintiffs' damages together, failed to account for tax benefits, and based administrative expenses on assumptions); *Furmanite America, Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1126, 1131-32 (M.D. Fla. 2007) (criticisms that expert lacked data, made unjustified assumptions, was contradicted by evidence, ignored financial data, and otherwise erred in applying methodology "implicate credibility rather than reliability" and are not grounds for exclusion under *Daubert*).

**D.    Mr. Eiserman's testimony would be relevant and helpful to the jury.**

Nerissa incorrectly argues that the purported flaws in Mr. Eiserman's opinion would mislead the jury, which cannot be remedied through cross-examination. (Mot. at 24-25). Not so. Mr. Eiserman's methodology was sufficiently reliable for the purposes of *Daubert*, and his opinion would assist the jury. Moreover, "[w]here the adversary system provides a party a full opportunity to refute an expert's testimony during cross-examination, exclusion due to the danger of misleading the jury is generally inappropriate". *U.S. v. 0.161 Acres of Land,* 837 F. 2d 1036, 1042 (11ᵗʰ Cir. 1988); *see also Nielsen Audio, Inc. v. Clem*, No. 8:15-CV-2435-T-27AAS, 2017 WL 1483353, at *3 (M.D. Fla. Apr. 24, 2017) (rejecting, as one of defendant's grounds to exclude expert report, the "general risk" that the jury will accord his opinion greater weight

simply because he is testifying as an expert, and noting that this "can be addressed and mitigated through cross examination and the testimony of a rebuttal expert").

Finally, Nerissa argues that Mr. Eiserman's opinion should also be excluded because she claims that fair market value is not the proper measure of damages in this case; according to Nerissa, the standard is whether "adequate or full consideration" was received for the GLI and GWI stock. (Mot. at 24-25). Nerissa's argument is a non-sequitur – even the case she cites (which addressed excise taxes for a prohibited transaction with an ESOP plan, not the issue here) defined "adequate consideration" for that purpose as "***the fair market value of the asset*** as determined in good faith by the trustee . . ." *Eyler v. Comm'r*, 88 F.3d 445, 454 (7th Cir. 1996) (emphasis supplied). And in any event, Nerissa's legal arguments relating to the measure of damages do not mean that Mr. Eiserman's testimony is inadmissible. *See Britt Green Trucking, Inc. v. FedEx Nat., LTL, Inc.*, No. 8:09-CV-445-T-33TBM, 2014 WL 2861485, at *5 (M.D. Fla. June 24, 2014) (expert testimony was relevant and admissible, despite argument that the claimed damages were legally unavailable outside a contractual notice period); *Hetrick v. Ideal Image Dev. Corp.*, No. 8:07-CV-871-T-33TBM, 2011 WL 672344, at *1, *3 (M.D. Fla. Feb. 17, 2011) (expert testimony was "relevant to the issue of causation," regardless of whether expert "failed to rule out every possible alternative cause").

## V.    CONCLUSION

Any perceived shortcomings in Mr. Eiserman's opinions might provide fodder for cross-examination and presentation of rebuttal evidence, but they are not grounds for the extreme remedy of wholesale exclusion. Mr. Eiserman is well-qualified to value businesses owning real estate, his methodology in this case was sufficiently reliable for the purposes of *Daubert*, and his opinion would assist the jury in understanding the evidence.

**WHEREFORE**, Plaintiff respectfully requests that Defendant's Motion be denied.

Respectfully submitted,

**PANKAUSKI HAUSER LAZARUS PLLC**
*Counsel for Plaintiff*
415 South Olive Avenue
West Palm Beach, FL  33401
Phone: (561) 514-0900
courtfilings@phflorida.com

By:    /s/ Jason D. Lazarus
       John J. Pankauski, Esquire
       Florida Bar No. 0982032
       john@phflorida.com
       Jason D. Lazarus, Esquire
       Florida Bar No. 139040
       jason@phflorida.com
       Andrew S. Kwan, Esquire
       Florida Bar No.
       andrew@phflorida.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 11, 2020, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system which will serve counsel of record on the attached service list.

By: /s/ Jason D. Lazarus
       Jason D. Lazarus

21

## SERVICE LIST

**Case No. 6:19-cv-01631-PGB-DCI**
**U.S. District Court, Middle District of Florida**

*Counsel for Defendants*
Kelly O'Keefe, Esquire
**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**
106 East College Avenue, Suite 700 Highpoint Center
Tallahassee, Florida 32301
kokeefe@stearnsweaver.com
cabbuhl@stearnsweaver.com
ptassinari@stearnsweaver.com

Michael Harwin, Esquire
**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**
150 W. Flagler St., Suite 2200
Miami, FL 33130-1545
mharwin@stearnsweaver.com

Chelsea Koff, Esquire
**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**
200 E. Las Olas Blvd. Fl. 21
Fort Lauderdale, FL 33301
ckoff@stearnsweaver.com

*Pro Hac Counsel for Gulfstream Lomas, Inc., Gulfstream Worldwide, Inc.,*
*Gulfstream Lomas, Ltd., Gulfstream Worldwide, Ltd.*
Eric Loman, Esquire
**Jackson Loman Stanford & Downey, PC**
201 Third St. N.W., Ste. 1500
Albuquerque, NM 87102
eric@jacksonlomanlaw.com